MICHAEL K. MOHRMAN [A4094]
ROOKER MOHRMAN RAWLINS & BAILEY LLP
170 South Main Street, Suite 850
Salt Lake City, Utah 84101
Telephone: (801) 534-0800
Fax No.: (801) 534-1203

ROBERT B. DENTON [0872]
DISABILITY LAW CENTER
205 North 400 West, 1st Floor
Salt Lake City, Utah 84103
Telephone: (801) 363-1347
Fax No.: (801) 363-1437

Attorneys for Petitioner

___

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

___

| | |
|---|---|
| DISABILITY LAW CENTER, <br><br> Plaintiff, <br><br> vs. <br><br> DISCOVERY ACADEMY, <br> BRENT HALL, Executive Director of Discovery Academy, BRENT HALL, dba Discovery Academy and IVY ACADEMY, INC. dba Discovery Academy, <br><br> Defendants. | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** <br><br> Case No. <br><br> Judge |

COMES NOW the plaintiff Disability Law Center ("DLC"), by and through its attorneys of record, and for its cause of action against the defendants states and alleges as follows:

## NATURE OF THE ACTION

1. This action seeks injunctive and declaratory relief pursuant to 29 U.S.C. 794e and 42 U.S.C. § 10805(a)(1)(B) and (a)(3) and (4) to prevent defendants from restricting or interfering with full, complete, and meaningful access of the DLC, the federally mandated Protection and Advocacy for the State of Utah, to the records, treating and educating staff, and individuals with disabilities in the State of Utah who have previously, currently, or in the future will receive treatment and services from defendant Discovery Academy.

## JURISDICTION AND VENUE

2. This action arises under the Protection and Advocacy for Individual Rights ("PAIR") Act, 29 U.S.C. § 794e and the Protection and Advocacy for Individuals with Mental Illnesses ("PAIMI") Act, 42 U.S.C. § 10801, *et seq., as amended*, 42 C.F.R. § 51

3. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. §§ 2201 and 2202 (declaratory relief), and Rules 57 and 65 of the Federal Rules of Civil Procedure.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to this claim occurred in this judicial district and division.

## PARTIES

    a.    Plaintiff

5.    The DLC is an independent, private non-profit corporation organized under the laws of the State of Utah, and at all relevant times has been and is the statewide Protection and Advocacy ("P&A") agency designated by the governor of the State of Utah to protect and advocate for the legal and civil rights of those citizens in the State of Utah who have disabilities, pursuant to the PAIR Act, 29 U.S.C. § 794e; the DD Act, 42 U.S.C. § 15041, *et seq.;* the PAIMI Act, 42 U.S.C. 10801, *et seq.*; and the Protection and Advocacy for Individuals with Traumatic Brain Injuries ("PATBI") Act, 42 U.S.C. §300d-52.

6.    As the duly designated statewide P&A for individuals with disabilities in the State of Utah, the DLC has the authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of and advocacy for the rights of individuals with mental and physical disabilities within the State. 29 U.S.C. § 794e(f)(3).

7.    The DLC is authorized to investigate incidents of abuse and neglect of those persons within the State of Utah who are or who may be eligible for treatment, services, and/or habilitation due to their physical and/or mental disabilities. PAIMI Act, 42 U.S.C. § 10801, *et seq., as amended;* the DD Act, 42 U.S.C. § 15041, *et seq.*; the PAIR Act, 29 U.S.C. § 794(e)).

8. Under 29 U.S.C. § 794e(f)(2) and 42 U.S.C. § 15043(a)(2)(B), DLC is authorized to investigate the abuse or neglect of individuals with mental illnesses if either the incidents are reported to the DLC or there is probable cause to believe that the incidents occurred.

9. The authorized investigations referred to in the previous two paragraphs include, but are not limited to, access to a facility's staff and records relating to the purported victims. This access includes but is not limited to the following: the policies, procedures, and protocols related to restraint, the Intensive Supervision Unit ("ISU"), seclusion or any other form of isolation; the policies, procedures and protocols related to training employees on the use of restraint, ISU, seclusion or any other form of isolation; the implementation of those policies, procedures or protocols; and physician, psychologist, therapist, or other staff assessments, progress notes, orders, social and medical histories, medication lists, medication administration records, incident reports, restraint, ISU, and seclusion or any other form of records of intrusive behavioral interventions of individuals who have been restrained, held in seclusion, held in any form of isolation and/or ISU, or been the recipient of any intrusive behavioral interventions during the past six months, as well as the names of their parents or legal guardians. This access also includes communication with the facility's staff relating to the purported victim's treatment or related systemic issues, access to all areas of the facility, access and communication with other residents, and access to other records and information necessary to complete the investigation.

10. The DLC has and will continue to suffer irreparable harm as a result of Defendants' actions and/or inactions absent the issuance of preliminary and permanent relief.

    b. Defendants

11. Upon information and belief, Discovery Academy is a dba of Ivy Academy, Inc. and Brent Hall, an individual residing in Utah County, State of Utah (hereinafter "DA").

12. Ivy Academy, Inc. is a Utah corporation in good standing.

13. Upon information and belief, defendant Discovery Academy ("DA") was licensed in 1989 as a clinical and therapeutic boarding school located at 105 North 500 West in Provo, Utah 84601.

14. Defendant Brent Hall, LMFT, is the current executive director at DA.

15. Defendant Hall has, at all times relevant, exercised general responsibility, supervision, and oversight of promulgation and implementation of the policies and practices of DA, and more specifically, the provision and coordination of all programs, treatment and services offered to those individuals with disabilities who are residents of DA.

16. At all times relevant to this cause, all of the defendants knew or should have known of the policies, practices, actions, and conditions alleged herein.

## FACTUAL ALLEGATIONS

17. Plaintiff re-alleges and incorporates herein paragraphs 1-14 above.

18. On or about June 1, 2005 the DLC received a credible allegation that B.B., a resident at DA, had been manually restrained for four hours and was bruised from it.

19. At that time the DLC formed a good faith belief that B.B. had mental illness and was receiving treatment for such while at DA.

20. On June 16, DLC staff sent a letter to DA requesting access to B.B. and the contact information of his parents, accompanied by an outline of DLC's authority for such a request.

21. On June 17, DLC staff met with B.B. at DA, where he reported that he was not injured from the restraint, that he was never restrained for longer than about 15 minutes, but that he had been restrained repeatedly during a four hour period.

22. B.B. also described being restricted to a room where he was isolated from other residents and staff for extended periods of time. He described how he had on one occasion been restricted to the room for up to fourteen hours. Further, his description of the ISU room further concerned the DLC and gave them probable cause to believe that B.B. and other students at DA may have been inappropriately restrained, secluded, or unnecessarily isolated. DLC staff also met with defendant Brent Hall on this date.

23. On June 21, DLC staff examined the Intensive Supervision Unit ("ISU") rooms and toured DA with defendant Brent Hall. The ISU rooms were small, barely large enough for a

twin mattress. During the visit Hall claimed that the rooms were the opposite of seclusion because students had intensive supervision from an employee of DA during their stays. DLC staff faxed a letter to Hall memorializing their view of the ISU room and requested a meeting to discuss DA's restraint and ISU policies. DLC staff sent another letter to Hall memorializing their view of the ISU room and requested DA's restraint and ISU policies and training procedures. DLC also received a release from B.B.'s parents and used it to obtain his records from DA.

24. On or before June 27, DLC staff formed a good faith belief that other current and former residents of DA had at the time of their residence at DA disabilities that made them eligible for DLC services.

25. On June 27, DLC staff met with a credible individual affiliated with DA regarding his concerns about DA. DLC staff determined that in order to complete the investigation it was necessary to have full access to the records of any student who had undergone restraint, seclusion, or ISU treatment for the past six months.

26. On June 28, DLC staff met with the executive director, residential program director, and clinical director at DA. At the meeting, DA staff informed DLC that there had been a "horseplay" and/or sexual abuse incident that involved calling the police. Additionally, DA's

attorney sent a letter challenging DLC's access authority alleging that B.B. does not have a disability even though DA's records include references of his having depression.

27. On June 29, DA's attorney, Robert Jeffs, reported that he was not going to give the DLC the list of names and contact information of students that had either been restrained or had been in the Intensive Supervision Unit because of his belief that DLC lacks access authority since DA does not handle or admit disabled children.

28. On July 1, DLC staff sent a letter to DA and Jeffs outlining its authority and again requesting access to the names and contact information of individuals or students who had been either restrained or held in the Intensive Supervision Unit.

29. On July 8, Jeffs sent a letter challenging DLC's access authority again, primarily because allegedly B.B. does not have a disability even though DA's records list him as having depression.

30. Between July 21 and August 4, 2005, DLC staff exchanged voice mail messages and had telephone conversations with Jeffs to discuss DLC's federal access authority and the DLC's access requests to DA.

31. On August 4, DLC staff met with Hall and Jeffs. Jeffs stated that children who come into DA with mental illness are immediately kicked out and that he still does not believe

that DLC has access authority. Hall was defensive throughout the meeting but said that he would provide DLC staff with an ISU log for those times B.B. was in the ISU room.

32. On August 8, DLC staff sent a letter to Jeffs stating that DLC would like general access to residents of DA, reports on allegations of abuse and neglect, and records of B.B.'s treatment and incidents.

33. On August 22, DLC staff received a reply letter from Jeffs stating that the DLC does not have general access to residents but that the other information requested would be provided by the following week.

34. On September 30, Jeffs faxed information to DLC staff regarding the DA's staff members involved with B.B.'s restraint.

35. Additional e-mail and voice messages were sent to Jeffs on October 11.

36. On October 17, DLC staff conducted interviews at the office of Jeffs & Jeffs of some DA staff members involved in B.B.'s restraint about the incident and DA's general restraint practices. Halls and Jeffs were present along with the following staff members: Robert Toelupe, a therapist; Alan Rasmussen, the boy's program supervisor, and Franck Tonga, a mentor with training in CPS and PCS.

37. On October 18, Jeffs faxed to DLC staff the last known addresses and phone numbers of two additional individuals involved in B.B.'s restraint: Kevin Crowley and Nathan Greene.

38. On November 11 and November 15, 2005 DLC staff had a telephone conversation and meeting with a special education behavioral expert to discuss restraint and seclusion, community standards, and definitions.

39. Between November 21 and November 29, 2005 DLC staff sent out two letters to DA, one requesting names of parents/guardians for the alleged sexual abuse victim and the other issuing a notification of monitoring. DLC staff also left a message with Jeffs about the investigative interviews.

40. Between December 5, 2005 and January 24, 2006 DLC left multiple messages and faxed a request to Jeffs to meet with DLC staff.

41. On January 25, 2006 DLC staff had a telephone conversation with Jeffs.

42. On February 1, 2006 Jeffs sent the Student Daily Schedule that DLC staff had requested earlier.

43. On February 2 and 3, 2006 DLC staff left messages for Jeffs.

44. On March 3, 2006 DLC staff faxed two letters to Jeffs, one that gave dates for general monitoring and a request to meet with two specific individuals, J.B. and P.A., and the other stating that DLC wanted to explore in greater detail DA's crisis intervention, ISU, and Reflection Point programs and policies, and offered possible times for a meeting and requested alternative dates if necessary.

45. On March 6, 2006 DLC staff faxed a letter retracting the dates set out in the March 3 letter for monitoring because adequate efforts had not been made to notify the parents or guardians of the minor students of the monitoring, as required by 42 C.F.R. § 51.42(e).

46. On March 12, 2006 DLC staff sent another letter to Jeffs after his failure to respond to the March 3 letter setting forth possible dates to meet regarding the crisis intervention programs. Additional times were suggested.

47. On March 20, 2006 DLC staff received a letter from Jeffs claiming that the DLC's investigations were terminated once the DLC received all of their previously requested information, and accusing the DLC of wanting to harass DA. Jeffs considered the request to meet with the specific students as a disguise to conduct an investigation under the title of monitoring. Also, Jeffs stated that DA wanted the DLC to make recommendations or suggestions about DA's restraint policy and had even offered for the DLC to make a presentation at the DA. Jeffs stated that because DLC had not responded to these suggestions, DLC's motives were in question.

48. On April 4, 2006, DLC staff replied to Jeffs' letter stating that (1) their restraint and ISU investigation had not been completed and additional information was needed before any recommendations could be made to DA; (2) the allegations made by specific individuals were confidential, not accepted on their face as truthful per se, but needed to be investigated; and (3) that the DLC was happy to make a presentation to the DA but had not recognized any offer from the DA. The letter further requested Jeffs and DA to cooperate in providing information and access necessary to complete the investigation.

49. On April 13 and 14, 2006, DLC staff drafted pleadings and faxed a letter to Jeffs regarding access to the name of a DA student who attempted suicide, and the contact information for the student's legal guardians. The letter also addressed the DLC's access authority as a P&A and provided the appropriate citations.

50. On April 20, 2006, DLC staff sent Jeffs another letter addressing DLC's difficulties in obtaining requested information about the student who recently attempted suicide, a date for the DLC's presentation to DA students and staff, and dates for interviews with DA students and staff. The letter suggested that Jeffs provide the DLC with the information at their meeting on April 26.

51. On April 26, 2006, DLC staff met with Jeffs, Brent Hall, and another DA staff member about PCS, specifically the standard compliance sequence and physical intervention/de-escalation techniques, the staffing of DA, ISU, and how the therapists counsel students.

52. On May 4 and 10, 2006, DLC staff left messages for Jeffs.

53. On May 29, 2006, DLC staff sent a letter to Jeffs reiterating a request for the names and contact information for A.B., the student who attempted suicide, the date for the DLC Presentation to DA students and staff, and dates for staff and student interviews.

54. On June 2, 2006, DLC staff received a letter from Jeffs refusing DLC's request for access to records. However, Jeffs indicated that DA would be open to consider implementing changes to its intensive supervision policy.

55. The defendant's conduct throughout this process has interfered with and hampered the Congressionally-mandated function and duties of DLC, and has specifically caused irreparable harm to the investigation of DA's restraint, seclusion, isolation, and Intensive Supervision procedures, policies, and actions with regard to B.B. and other students with a disability, or to investigate complaints of other residents.

56. Consequently, defendant's actions and/or inactions have unlawfully interfered with DLC's rights and ability to be an effective P&A system. Defendants have acted

individually and collectively in their official capacities to maintain a practice that hampers and directly conflicts with the Congressionally-mandated functions and duties of the DLC.

57. As described in the foregoing paragraphs, the DLC has attempted to resolve its access issues with defendants. These attempts have proven unsuccessful.

58. Plaintiff DLC has suffered and continues to suffer direct injury to its statutory interest in providing P&A services to residents at DA.

59. Plaintiff DLC has standing to bring this action on its own behalf. Defendants' refusal to allow the DLC to have full and meaningful access to DA's records, staff, and residents, as described more fully above, constitutes an injury in fact to plaintiff's legally-protected interest. This injury is concrete, particularized, actual, and imminent. There is a causal relationship between the injury and defendant's challenged conduct and a favorable decision by this court will redress the injury.

60. Plaintiff DLC has no adequate remedy at law.

## CAUSE OF ACTION

Violation of DLC's Rights Under 29 U.S.C. 794e; and 42 U.S.C. § 10805(a)(1)(B), (a)(3) and (4).

61. Plaintiffs re-allege the allegations in paragraphs 1 through 58 above.

62. B.B. qualifies as a person eligible for services.

63. Pursuant to 29 U.S.C. 794e the plaintiff has the right to access B.B.'s records at DA based upon complaint and upon plaintiff's determination that the information received thus far is sufficient to establish a probable cause belief that residents at DA have been and will be subject to inappropriate restraint, seclusion, isolation, and Intensive Supervision Unit activities, and unnecessary intrusive behavioral interventions while residents at DA.

64. Defendants have violated the rights of the plaintiff DLC, which are secured by the Protection and Advocacy for Individual Rights ("PAIR") Act, 29 U.S.C. § 794e; and the Protection and Advocacy for Individuals with Mental Illnesses ("PAIMI") Act, 42 U.S.C. § 10801, *et seq., as amended*, 42 C.F.R. § 51; by, *inter alia*:

    a. Denying the DLC its federally-mandated access rights to DA residents J.B., P.A., A.B. and their guardian contact information.

    b. Irreparably impeding the DLC from fulfilling its federal mandate to conduct full investigations of alleged and probable cause beliefs of seclusion, isolation, restraint, the Intensive Supervision Unit activities, and unnecessary intrusive behavioral interventions of individuals with disabilities who are currently or who will be residents at DA.

    c. Irreparably impeding the DLC from fulfilling its federal mandate to pursue appropriate remedies for individuals with disabilities who are currently or who will be residents at DA in order to protect their rights.

      d.      Irreparably impeding the DLC from fulfilling its federal mandate to conduct its other federally mandated activities to protect and advocate on behalf of individuals with disabilities who are currently or who will be residents at DA.

65. The policy and actions of the defendants violate the right of plaintiff to meaningful and timely access to DA records, staff, and residents in general and to the above-named residents specifically in violation of 29 U.S.C. 794e; and 42 U.S.C. § 10805(a)(1)(B), (a)(3) and (4). The policy and actions, unless enjoined, will violate DLC's right to that information in the event of future abuse and probable cause determinations.

66. Plaintiff has no fair or adequate remedy at law and has and will continue to suffer irreparable harm absent preliminary and permanent injunctive relief.

INJUNCTIVE AND DECLARATORY RELIEF

67. Plaintiff seeks a preliminary and permanent injunction enjoining the defendant, its agents and employees, from denying DLC full and immediate access to the information and records requested above, and from denying DLC full and immediate monitoring access to DA and to the other DA residents and their records if a complaint is received and/or DLC makes a probable cause determination.

68. Plaintiff requests that after notice and hearing, this court enter a declaratory judgment that the defendant's policies, regulations, practices and conduct of interfering with and

denying the plaintiff proper and immediate access violates 29 U.S.C. 794e; and 42 U.S.C. § 10805(a)(1)(B) and (a)(3) and (4); and the regulations promulgated thereto.

WHEREFORE, plaintiff DLC respectfully prays for the following relief:

1. For an order assuming jurisdiction over this case.

2. For an order declaring that the defendant's actions and inactions as described violate plaintiff's rights under 29 U.S.C. 794e; and 42 U.S.C. § 10805(a)(1)(B), (a)(3) and (4); and the regulations promulgated thereto.

3. For an order directing defendants to immediately provide plaintiff DLC with full, immediate, and effective access to the residents of Discovery Academy for the purpose of its investigation of DA's restraint, seclusion and intrusive intervention practices, as well as necessary guardian contact information for the DLC during its investigation, as well as guardian contact information for J.B., P.A., A.B.

4. For an order enjoining the defendant, its agents or employees from denying the DLC full and immediate access to DA for monitoring purposes and to individuals receiving services at DA and their records if a complaint is received and/or a probable cause determination has been made to the extent mandated by the above referenced federal statutes.

5. For an order awarding plaintiff its reasonable costs and attorney fees incurred in bringing this action.

6. For an order granting plaintiff such other and further relief as this court deems just and proper.

DATED this 12th day of July, 2007.

           ROOKER MOHRMAN RAWLINS & BAILEY


           _____/s/_____
           Michael K. Mohrman
           Attorneys for Plaintiff