TONY SCOTT, Assistant Attorney General
BRETT L. TOLMAN, United States Attorney (#8821)
JARED C. BENNETT, Assistant United States Attorney (#9097)
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

SHEILA LIEBER, Deputy Director
KATHRYN L. WYER, Trial Attorney (#9846)
U.S. Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
Telephone: (202) 616-8475
*Attorneys for the United States*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH CENTRAL DIVISION

---

| | | |
|---|---|---|
| DISABILITY LAW CENTER, | : | Case No: 2:07-cv-511 CW-PMW |
| | : | |
| Plaintiff, | | **MEMORANDUM IN SUPPORT OF** |
| vs. | | **THE CONSTITUTIONALITY OF** |
| : | | **THE PAIMI ACT** |
| DISCOVERY ACADEMY et al., | : | |
| Defendant. | : | |

---

## INTRODUCTION

The United States has intervened in this case for the purpose of defending the

constitutionality of the Protection and Advocacy for Individuals with Mental Illness ("PAIMI")

Act, 42 U.S.C. §§ 10801-10851.  The PAIMI Act provides federal funding to independent entities

designated by a state to protect and advocate the rights of individuals with mental illness – a

population that Congress has identified as especially vulnerable to abuse and neglect.  The PAIMI

Act also provides authority to such entities to gain access to facilities in the state providing care or treatment to mentally ill individuals, both for monitoring purposes and to investigate alleged instances of abuse or neglect.  This authority extends to interviewing the facility's residents and, in some circumstances, to accessing certain records.

The defendants argue that the authority granted by the PAIMI Act violates the Fourth Amendment.  However, a residential treatment facility such as defendant Discovery Academy ("Academy") is subject to a host of regulations under state law, which include unannounced inspections.  Such entities qualify as closely regulated businesses that have a particularly low expectation of privacy in their premises.  The Supreme Court has recognized that searches of such entities may be reasonable even without a warrant or probable cause.  The PAIMI Act, together with implementing regulations promulgated by the U.S. Department of Health and Human Services ("HHS"), the federal agency charged with administering the PAIMI Act, give notice to entities providing care or treatment to individuals with mental illness that they are subject to search and sufficiently define the scope of these searches and the purposes for which they may be conducted.   The statutory and regulatory scheme fits well within Fourth Amendment standards.

While the defendants raise additional constitutional arguments, they are easily disposed of as meritless.  The defendants fail to raise a meaningful challenge under the separation of powers doctrine; their argument that a warrant is required is simply a reformulation of their Fourth Amendment challenge and should be rejected for the same reasons as that challenge.  (The defendants' vagueness challenge, which they appear to have abandoned, presents a similar reformulation of their Fourth Amendment argument and is similarly meritless.)  In addition, the defendants' attempt to invoke the privacy interests of their residents should be disregarded based

on the well-established rule that one may only assert one's own expectation of privacy when

claiming a Fourth Amendment violation.

## STATUTORY AND REGULATORY FRAMEWORK

Congress enacted the PAIMI Act in 1986 based on its finding, after extensive

investigation, that individuals with mental illness are vulnerable to abuse, neglect, and serious

injury, and that existing state systems for protecting the rights of these individuals varied widely

and were frequently inadequate.  42 U.S.C. § 10801(a)(1)-(4).  The statute is designed to

encourage states to establish protection and advocacy systems (commonly called "P&A systems")

that will advocate on behalf of and, as necessary, take action to protect individuals with mental

illness.[1]  Id. § 10801(b).[2]

To that end, the PAIMI Act authorizes federal funding (called "allotments") to states in

order to establish P&A systems that will protect and advocate the rights of individuals with

mental illness and to investigate reported or suspected incidents of abuse and neglect of such

---

[1] The statute defines an "individual with mental illness" as any individual, whether in a
home, community, or facility setting, "who has a significant mental illness or emotional
impairment, as determined by a mental health professional qualified under the laws and regulations
of the State."  42 U.S.C. § 10802(4)(A).

[2] Legislative history indicates that Congress enacted the PAIMI Act "to facilitate the
establishment of a system in each State" that could "investigate reported incidents of abuse and
neglect of mentally ill persons and . . . assist in the protection of their established rights under
Federal, State and local statutes and the United States Constitution."  S. Rep. No. 99-109, at 7
(1985), reprinted in 1986 U.S.C.C.A.N. 1361, 1367.  The Senate report suggests that the PAIMI
Act was intended to provide P&A systems with broad access. E.g., id. at 5 (stating that "[i]t is
the intent of the Committee that the eligible [P & A] system and programs . . . have the fullest
possible access to client records with appropriate authorization and access to facilities where a
complaint has been received on behalf of a mentally ill person").

individuals.  42 U.S.C. § 10803.[3]  The state may designate either a public or a private entity as a P&A system.  See, e.g., id. §§ 10804(b)(1), 10805(c)(1)(B).  In either case, to ensure that P&A systems can operate effectively, the PAIMI Act requires that any such system be independent of any agency within the state that provides mental health treatment and services.  Id. § 10805(a)(2).  As a means of detecting and deterring mistreatment of individuals with mental illness, the PAIMI Act requires that P&A systems be granted authority to access facilities that provide care or treatment to mentally ill individuals and to conduct investigations of incidents of abuse and neglect.[4]  See 42 U.S.C. § 10805(a)(3) (authorizing access to such facilities); id. § 10805(a)(1)(A) (authorizing investigations of "incidents of abuse and neglect of individuals with mental illness"); id. § 10805(a)(4) (authorizing access to the records of an individual with mental illness under specified circumstances).

HHS regulations further define the framework within which a P&A system may engage in

_____

[3]The entities eligible to receive this funding are those that states have established to protect and advocate the rights of persons with developmental disabilities under part C of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("DD Act"), 42 U.S.C. §§ 10541 et seq.  42 U.S.C. § 10802(2).  The statute requires that these federal funds be used to supplement rather than supplant nonfederal funds available in the state to protect and advocate the rights of individuals with mental illness, and that the system's staff be trained to provide advocacy services to individuals with mental illness and to work with the family members of such individuals.  Id. § 10821(a)(1), (2).

[4]By regulation, these facilities include "any public or private residential setting that provides overnight care accompanied by treatment services," including "general and psychiatric hospitals, nursing homes, board and care homes, community housing, juvenile detention facilities, homeless shelters, and jails and prisons."  42 C.F.R. § 51.2.  The Second Circuit has recognized that, following Congress's 2000 amendment of the PAIMI Act, the facilities subject to P&A system access include those with nonresidential as well as residential programs.  Conn. Off. of P&A for Persons with Disabilities v. Hartford Bd. of Educ., 464 F.3d 229, 240 (2d Cir. 2006) (holding that "a school that provides a therapeutic educational program for students who are seriously emotionally disturbed" qualified as a "facility" within the meaning of the PAIMI Act).

-4-

both monitoring and investigatory activities in facilities providing care or treatment to individuals with mental illness.  See 42 C.F.R. §§ 51.1 -.46.  In regard to monitoring, the regulations state that "[w]herever possible," a P&A system "should establish an ongoing presence in residential mental health care or treatment facilities."  Id. § 51.31(c).  The system's activities "should be carried out in a manner which allows program staff to . . . [i]nteract regularly with those individuals who are current or potential recipients of protection and advocacy services," "[i]nteract regularly with staff providing care or treatment," and "[o]btain information and review records."  Id. § 51.31(d)(1)-(3).

The regulations specifically authorize a P&A system to "have reasonable unaccompanied access to public and private facilities and programs in the State which render care or treatment for individuals with mental illness, and to all areas of the facility which are used by residents or are accessible to residents."  Id. § 51.42.  A facility must allow this access "at reasonable times, which at a minimum shall include normal working hours and visiting hours," and "P&A activities shall be conducted so as to minimize interference with facility programs, respect residents' privacy interests, and honor a resident's request to terminate an interview."  Id. § 51.42(c).  This access is authorized in order for the P&A system to (1) provide education, training, and referrals to programs addressing the needs of individuals with mental illness, and information and training about the rights of individuals with mental illness and the services that the P&A system can provide; (2) "[m]onitor[] compliance with respect to the rights and safety of residents"; and (3) inspect, view and photograph "all areas of the facility which are used by residents or are accessible to residents."  Id. § 51.42(c)(1)-(3).  The access must include "the opportunity to meet and communicate privately" with residents, including minors and adults with legal guardians.  Id. §

-5-

51.42(d).  However, the P&A system is required to "make every effort to ensure that the parents of minors or guardians of individuals in the care of a facility are informed that the system will be monitoring activities at the facility and may in the course of such monitoring have access to the minor or adult with a legal guardian."  Id. § 51.42(e).  A P&A system may not take "formal action on behalf of individuals with legal guardians or conservators" without appropriate consent, except in specified emergency situations.  Id.

In regard to investigations, the PAIMI Act authorizes a P&A system "to . . . investigate incidents of abuse and neglect [5] of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred."  42 U.S.C. § 10805(a)(1)(A); see also 42 C.F.R. § 51.42(b) (authorizing a "full investigation of an incident of abuse or neglect" based on a probable cause determination, a reported incident or complaint, or a determination "that there is or may be imminent danger of serious abuse or neglect of an

---

[5]The PAIMI Act defines "abuse" as "any act or failure to act by an employee of a facility rendering care or treatment which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to a individual with mental illness."  42 U.S.C. § 10802(1).  Such acts specifically include "the rape or sexual assault of a individual with mental illness;" "the striking of a individual with mental illness;" "the use of excessive force when placing a individual with mental illness in bodily restraints;" and "the use of bodily or chemical restraints on a individual with mental illness which is not in compliance with Federal and State laws and regulations."  Id.  The PAIMI Act defines "neglect" as

> a negligent act or omission by any individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to a individual with mental illness or which placed a individual with mental illness at risk of injury or death, and includes an act or omission such as the failure to establish or carry out an appropriate individual program plan or treatment plan for a individual with mental illness, the failure to provide adequate nutrition, clothing, or health care to a individual with mental illness, or the failure to provide a safe environment for a individual with mental illness, including the failure to maintain adequate numbers of appropriately trained staff.

Id. § 10802(5).

individual with mental illness").  A "probable cause" determination may be made based on a P&A system's monitoring activities, as well as any other P&A system activities.  42 C.F.R. § 51.31(g). By regulation, "probable cause" is defined as "reasonable grounds for belief that an individual with mental illness has been, or may be at significant risk of being subject to abuse or neglect." Id. § 51.2.  The person making this determination "may base the decision on reasonable inferences drawn from his or her experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect."  Id.

    An investigation under this framework entails "reasonable unaccompanied access to residents at all times necessary" for purposes of the investigation, and "the opportunity to interview any facility service recipient, employee, or other persons, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation."  Id.   In addition, the statute authorizes a P&A system, in accordance with 42 U.S.C. § 10806, to

> have access to all records of . . . any individual . . . with respect to whom a complaint has been received by the [P&A] system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect.

42 U.S.C. § 10805(a)(4)(B)(iii).

    A facility that delays or denies a P&A system's access must promptly provide a "written statement of reasons" for the denial.  42 C.F.R. § 51.43.  If the denial is due to an alleged lack of authorization from minors' parents or guardians, the facility must provide the P&A system with contact information for the parents or guardians.  Id.  A P&A system is authorized to use "any appropriate technique," in accord with the law and professional ethics, in order to carry out its

duties, and to "pursue administrative, legal or other appropriate remedies." Id. § 51.31(a).

## FACTUAL AND PROCEDURAL BACKGROUND[6]

Plaintiff DLC is an independent nonprofit organization that has been designated by the Governor of Utah as the state's P&A system. In June 2005, DLC received a report that a minor resident at the Academy, a private school, had been bruised while being manually restrained for four hours.[7] DLC believed that the resident, B.B., was an individual with mental illness and was being treated for this illness at the Academy. Accordingly, DLC submitted a letter to the Academy requesting contact information for B.B.'s parents and asking to interview B.B. The Academy allowed this interview. Based on information obtained during the interview, DLC requested access to the Academy, including its Intensive Supervision Unit ("ISU") rooms, where, according to B.B., Academy students were sometimes secluded. DLC also obtained a release from B.B.'s parents that gave them access to B.B.'s records, which referred to his having depression. B.B.'s parents removed him from the Academy on or about June 17, 2005.

In late June 2005, DLC received a report from another individual affiliated with the Academy that expressed concerns. In addition, at a meeting with Academy staff, DLC was told about a "horseplay" or sexual abuse incident that had involved calling the police. DLC then

---

[6]In this section, the United States indicates its understanding of the facts of this case, based on the parties' pleadings and other filings on the docket, including the parties' summary judgment papers.

[7]As indicated above, the PAIMI Act's definition of "abuse" includes "the use of bodily or chemical restraints on a individual with mental illness which is not in compliance with Federal and State laws and regulations." 42 U.S.C.A. § 10802(1)(D). Utah law prohibits physical restraint of students in schools, except for that which is reasonable and necessary to remove a weapon, remove a violent or disruptive child, or prevent harm to others or to property. Utah Code Ann. § 53A-11-802. A private school may exempt itself from this provision, but only if it notifies the parents or guardians of the children in the school of the exemption. Id. § 53A-11-802(4).

requested the names and parent contact information for all students at the Academy that had been restrained, secluded, or held in ISU rooms during the past six months. The Academy denied this request on the basis that none of its residents were disabled. While the Academy provided additional information about B.B., it refused to allow DLC staff to have access to its facility or to other Academy residents.

In November 2005, DLC sent the Academy a letter indicating its intent to begin monitoring activities in the Academy. A subsequent letter, sent on March 3, 2006, notified the Academy of the dates on which DLC proposed to engage in monitoring activities, requested that DLC staff be given access to two specific Academy students, and requested a meeting with Academy staff to discuss the Academy's crisis intervention and ISU policies. DLC then retracted the proposed monitoring dates on the basis that it had not yet made adequate efforts to notify the parents or guardians of Academy students that monitoring activities would occur, as required by 42 C.F.R. § 51.42(e). In April 2006, DLC requested that the Academy provide the name of A.B., an Academy student who had attempted suicide, and contact information for the student's legal guardians, and explained DLC's access authority as a P&A system. The Academy contends that it has been open to recommendations from DLC regarding restraint and seclusion but that DLC has not provided recommendations; DLC contends that it is still in the process of investigating the Academy's restraint and ISU practices and cannot make recommendations until this investigation is complete.

DLC filed suit on July 12, 2007, seeking a declaration that DLC is entitled to engage in monitoring activities at the Academy and an order compelling the Academy to provide DLC with access for monitoring purposes and for purposes of investigating the Academy's restraint,

seclusion, and intrusive intervention practices.  During discovery, DLC made a request under Fed. R. Civ. P. 34 that its expert be allowed to inspect the Academy, and to interview Academy students and staff, for purposes of determining whether the Academy serves students with mental illness, as defined in the PAIMI Act, 42 U.S.C. § 10802(4).  The Academy objected to this request on the basis that allowing access to student medical records would violate HIPAA, that allowing interviews of students and staff would invade the privacy interests of those individuals, and that interviews were outside the scope of what can be requested under Fed. R. Civ. P. 34. (See doc. #12.)  On December 1, 2008, DLC filed a motion to compel compliance with its Rule 34 request.  (Doc. #17.)  In opposition, the Academy argued, among other things, that the PAIMI Act violates the Fourth Amendment and the separation of powers doctrine and is unconstitutionally vague.  (Doc. #22.)  On February 24, 2009, the Academy moved for summary judgment, restating its Fourth Amendment and separation of powers arguments but apparently abandoning its vagueness argument. (Doc. #35.)  The Court has consolidated its consideration of these two motions.  After the Academy filed a Notice of Claim of Unconstitutionality regarding both its summary judgment motion and its opposition to DLC's motion to compel, the Court certified the constitutional challenge to the Attorney General pursuant to Fed. R. Civ. P. 5.1(b) and DUCivR 24-1(a).  Pursuant to 28 U.S.C. § 2403, the United States then moved to intervene in this case in order to defend the constitutionality of the PAIMI Act.

## ARGUMENT

As an initial matter, the United States is aware that the plaintiff in this case has argued that it is not subject to constitutional restrictions when conducting searches pursuant to the PAIMI Act because it is not a "state actor." Pl. SJ Opp. at 17-18. However, the Fourth Amendment constrains the ability of Congress and the states to authorize a search of private property, regardless of whether the entity authorized to conduct the search is a public or private actor. The United States therefore does not contest the applicability of the Fourth Amendment to the PAIMI Act. Contrary to the defendants' arguments, however, the framework established by the PAIMI Act and its implementing regulations, pursuant to which P&A systems are authorized to access facilities providing care and treatment to individuals with mental illness, complies with Fourth Amendment requirements.[8]

---

[8]Defendants assert facial constitutional challenges – all of which (as explained below) are essentially Fourth Amendment challenges – based on the PAIMI Act's statutory scheme and language. In order to succeed on a facial challenge, defendants must establish that "the statute is impermissible in all, or at least the 'vast majority[,] of its intended applications.'" United States v. Friday, 525 F.3d 938, 951 (10th Cir. 2008) (quoting Doctor John's, Inc. v. City of Roy, 465 F.3d 1150, 1157 n.5 (10th Cir. 2006)); see also Wash. State Grange v. Wash. State Republican Party, 128 S. Ct. 1184, 1190-91 (2008) (discussing the applicable standard and recognizing facial challenges are "disfavored"). The United States does not intend to assert that there could never be a valid constitutional challenge to the PAIMI Act as applied in a specific circumstance. However, "[a] plaintiff may challenge a statute or regulation on an as-applied basis 'only insofar as it has an adverse impact on his own rights.'" Id. (quoting County Court of Ulster County v. Allen, 442 U.S. 140, 155 (1979)). While defendants have argued that the access sought by plaintiff in this case "exceeds the scope and purpose" of the PAIMI Act – an issue on which the United States takes no position – they do not appear to assert an as-applied constitutional challenge.

I.   **THE WARRANTLESS ACCESS AUTHORIZED BY THE PAIMI ACT TO FACILITIES PROVIDING CARE AND TREATMENT TO MENTALLY ILL INDIVIDUALS IS CONSISTENT WITH THE FOURTH AMENDMENT**

The Court should reject the defendants' Fourth Amendment challenge to the PAIMI Act. The Fourth Amendment "protects the right of the people to be secure . . . against unreasonable searches and seizures." United States v. Herrera, 444 F.3d 1238, 1242 (10th Cir. 2006) (internal quotation omitted). The Warrant Clause of the Fourth Amendment provides that no warrant shall issue except upon probable cause. Generally, a search will not be deemed reasonable unless it is undertaken pursuant to a warrant (and thus supported by probable cause). See United States v. Carter, 511 F.3d 1264, 1267 (10th Cir. 2008). However, the Supreme Court has recognized exceptions to this requirement "'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" Id. (quoting Griffin v. Wisconsin, 483 U.S. 868, 873 (1987)). In particular, the Court has recognized a "greater latitude to conduct warrantless inspection of commercial property," due to the low expectation of privacy that a commercial property owner has in comparison with "the sanctity accorded an individual's home." Donovan v. Dewey, 452 U.S. 594, 598-99 (1981).

In accord with these principles, the Supreme Court has repeatedly sustained warrantless inspections of businesses operating in the context of a closely regulated industry. See, e.g., New York v. Burger, 482 U.S. 691 (1987) (vehicle dismantling industry); Donovan, 452 U.S. 594 (underground and surface mining industry); United States v. Biswell, 406 U.S. 311 (1972) (gun dealers); Colonnade Catering Corp. v. United States, 397 U.S. 72 (1970) (alcoholic beverage industry); see also S & S Pawn Shop Inc. v. City of Del City, 947 F.2d 432, 439 (10th Cir. 1991) (pawnshops). In this context, an administrative search scheme is deemed reasonable if (1) there is

a "substantial government interest that informs the regulatory scheme pursuant to which the inspection is made," (2) the warrantless inspections are "necessary to further [the] regulatory scheme," and (3) the "inspection program, in terms of the certainty and regularity of its application, provid[es] a constitutionally adequate substitute for a warrant." Burger, 482 U.S. at 702-03. The third criterion is met when the regulatory scheme provides a "properly defined scope" so that the property owner "cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes," and the scheme "limit[s] the discretion of the inspecting officers" in "time, place, and scope." Id.

Here, the defendants appear to concede that the Academy is part of a closely regulated industry, as they agree that the Burger analysis applies.[9] See Def. SJ Mem. at 7-8. Indeed, they

_____

[9]According to online public records, the Academy is licensed as a "residential treatment facility," as that term is defined in Utah Code Ann. § 62A-2-101(27). See Utah Dep't of Human Services Office of Licensing, http://www.hslic.utah.gov (indicating that the Academy provides residential treatment to individuals between the ages of 12 and 18). As such, the Academy is subject to administrative inspections by the state and local government in order to ensure compliance with a host of statutory and administrative requirements. Utah Code Ann. § 62A-2-108.3(4), -118; see also Utah Admin. Code R501-2-1 to -15, R501-19-1 to -13. Academy employees with direct access to children are also subject to criminal background checks. Utah Code Ann. § 62A-2-120. In addition to its status as a residential treatment facility, the Academy also operates as a private school. See Utah State Office of Education, http://www.schools.utah.gov/curr/accred/directory.htm (listing the Academy as an accredited private school). It is therefore subject to state regulation on that basis as well. See, e.g., Utah Code Ann. §§ 53A-6-502 (requiring private school employees to report physical or sexual abuse of students), 53A-11-601 (regulating the administration of medications to K-12 students by public or private schools), -802 (regulating the use of corporal punishment by public or private schools), 53A-29-102 (regulating the ability of public or private schools to offer internships), 62A-2-108.1 (addressing the ability of private schools to receive accreditation). The totality of these provisions suggests that the Academy is part of a closely regulated industry and therefore has a significantly diminished expectation of privacy in its premises. The only court to have analyzed the constitutionality of the PAIMI Act under the Fourth Amendment similarly concluded that the facility in that case, a psychiatric medical institution for children, was part of a closely regulated industry. Iowa P&A Servs., Inc. v. Tanager Place, No. 04-0069, 2004 WL 2270002, at *18 (N.D. Iowa Sept. 30, 2004), rev'd on other grounds by 427 F.3d 541 (8th Cir. 2005).

do not contest that the PAIMI Act satisfies the first and second criteria of the analysis.  See id. at

8.  Certainly, the United States' interest in protecting individuals with mental illness from abuse

and neglect is substantial.  The Supreme Court has previously recognized the strong government

interest in protecting health and safety.  See, e.g., Pharm. Research & Mfrs v. Walsh, 538 U.S.

644, 666 (2003) (recognizing state's interest in protecting health of uninsured residents); Rubin v.

Coors Brewing Co., 514 U.S. 476, 485 (1995) (recognizing federal government's "significant

interest in protecting the health, safety, and welfare of its citizens"); Donovan, 452 U.S. at 602

(acknowledging federal interest in improving health and safety conditions in mines).  This interest

is intensified here where Congress has found, based on a series of hearings, that individuals with

mental illness are at risk of being subject to abuse and neglect in the very facilities claiming to

provide them with care and treatment.  42 U.S.C. § 10801(a)(1)-(3).[10]

There is also no question that warrantless inspections are essential to achieving the

purpose of the PAIMI Act.  The Supreme Court has emphasized that unannounced inspections

are the only means of detecting and deterring violations that may otherwise be readily concealed.

See Donovan, 452 U.S. at 603 (recognizing the "notorious ease with which many safety or health

hazards may be concealed if advance warning of inspection is obtained" in the mining context

(internal quotation omitted)); Burger, 482 U.S. at 710 ("surprise is crucial" in the vehicle

dismantling context).  Conditions of abuse and neglect may be hidden by a facility in the absence

of the PAIMI Act's warrantless inspection scheme.  Analyzing a Fourth Amendment challenge in

---

[10] See, e.g., Mental Health:  Hearings Before the House Subcomm. on Health and the
Environment, 99th Cong. (1985); Care of Institutionalized Mentally Disabled Persons:  Joint
Hearings Before the Senate Subcomms. on the Handicapped and on Labor, Health and Human
Services, Education, and Related Agencies, 99th Cong. (1985).

the similar context of nursing homes, the Second Circuit recognized that nursing home patients are in a particularly vulnerable situation and may not be able to complain about mistreatment. Blue v. Koren, 72 F.3d 1075, 1081 (2d Cir. 1995).  Accordingly, "[u]nannounced, on-site inspections" were deemed "essential to the regulatory scheme."  Id.

While not contesting the importance of the PAIMI Act's objectives or that warrantless inspections are necessary to achieve these objectives, the defendants assert that the access authorized under the PAIMI Act fails to satisfy the third criterion set forth in Burger ; in other words, they argue that the inspection scheme set forth in the PAIMI Act and its implementing regulations fails to provide an adequate substitute for a warrant.  However, Burger makes clear that this requirement is not intended to be an especially demanding one.  The relevant part of the statute in Burger simply provided that, "'[u]pon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.'"  482 U.S. at 694 n.1 (quoting the statute).  Burger held that this provision adequately informed operators that inspections would occur and adequately constrained the scope of the inspection, although, as the dissent noted, the only actual constraint on the inspection was the requirement that it take place during regular business hours.  See id. at 723.

The search authority granted by the PAIMI Act and HHS regulations is equally well defined.  The defendants misrepresent the scheme set forth in the Act, citing only the general language in 42 U.S.C. § 10805(a)(3), which provides that a state's P&A system "shall . . . have access to facilities in the State providing care or treatment [to individuals with mental illness]."

-15-

The defendants argue that this general statement "provides no guidance or limitation regarding any such inspection,"  Def. SJ Mem. at 7, and allege that the plaintiff is relying on this broad language to seek access of "unlimited scope," Def. SJ Mem. at 9.  When the seemingly broad authority set forth in 42 U.S.C. § 10805(a)(3) is properly examined within the entire framework of the PAIMI Act and its implementing regulations, as set forth above, the error of the defendants' contention is readily apparent.[11]

To begin with, as indicated above, the authority of a P&A system under the PAIMI Act and its implementing regulations is twofold, encompassing both monitoring authority, which does

---

[11]The defendants' vagueness challenge, asserted in their opposition to the plaintiff's motion to compel compliance with its Rule 34 discovery request, also focused on the alleged vagueness of the term "access."  See Def. Opp. to Mot. to Compel, at 23-25.  In response to this argument, the plaintiff pointed out that the access that it sought through its motion to compel was pursuant to Fed. R. Civ. P. 34, not pursuant to the PAIMI Act, making the defendants' constitutional arguments irrelevant to the plaintiff's motion, and that (similar to the defendants' Fourth Amendment claim, as just described) the defendants' vagueness challenge failed to take into account the HHS implementing regulations.  Pl. Reply in Support of Mot. to Compel, at 4, 16-17.  Because the defendants did not then reassert their vagueness challenge in their motion for summary judgment, it appears that they have abandoned that challenge.  If considered at all, the defendants' vagueness challenge should be rejected because (just like their separation of powers claim discussed below) it is simply a reformulation of their Fourth Amendment challenge.  A statute may be held unconstitutionally vague under the Due Process Clause "if its prohibitions are not clearly defined," such that a person of ordinary intelligence would not understand what conduct is prohibited, or such that the statute is subject to "enforcement" (by inflicting some penalty on a person or entity that engages in the prohibited conduct) in an arbitrary manner.  Faustin v. City & County of Denver, 423 F.3d 1192, 1201 (10th Cir. 2005) (emphasis added) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)).  The defendants' argument regarding the term "access" in the PAIMI Act makes no sense as a vagueness challenge because the term is not used in connection with any prohibition on the conduct of entities such as the Academy; rather, it is used in connection with the statute's grant of authority to a P&A system to inspect facilities providing care or treatment to individuals with mental illness.  See 42 U.S.C. § 10805(a)(3).  The defendants' argument here essentially repeats the same argument made in support of their Fourth Amendment challenge – that the PAIMI Act fails to define the scope of the search that is authorized.  As discussed herein, that argument is without merit.

-16-

not require the P&A system to have any basis for believing abuse or neglect of mentally ill individuals has occurred in the facility, and investigatory authority, which does.  The statutory and regulatory framework provides separate standards for gaining access for monitoring and inspection purposes, on the one hand, and for investigatory purposes, on the other.  Cf. Conn. Off. of P&A For Persons With Disabilities v. Hartford Bd. of Educ., 464 F.3d 229, 242 (2d Cir. 2006) (recognizing a P&A system's monitoring and investigatory authorities as distinct under the parallel structure of the DD Act, 42 U.S.C. §§ 15001 et seq.).  Each of these standards separately provides an adequate substitute for a warrant.

With respect to a P&A system's monitoring activities, HHS regulations authorize a P&A system to have "reasonable unaccompanied access to facilities . . . at reasonable times, which at a minimum shall include normal working hours and visiting hours."  42 C.F.R. § 51.42(c).  The P&A system is directed to "minimize interference with facility programs, respect residents' privacy interests, and honor a resident's request to terminate an interview."  Id.  The HHS regulation also defines the purposes for which access must be provided, limiting these purposes to (1) informational and training purposes, (2) "[m]onitoring compliance with respect to the rights and safety of residents," and (3) "[i]nspecting, viewing and photographing all areas of the facility which are used by residents or are accessible to residents."  Id. § 51.42(c)(1)-(3). These limitations are similar to those that other courts, including the Tenth Circuit, have found sufficient when upholding warrantless administrative searches.  See United States v. Branson, 21 F.3d 113, 117 (6th Cir. 1994) (upholding a warrantless administrative search of an auto repair shop as reasonable where the governing state statute "notifies all persons or business entities that buy or sell used auto parts that inspections are authorized" and "incorporates limitations on the

inspections, requiring that they be conducted during normal business hours, in a manner that minimizes interference, and limits their scope to records and vehicles and parts"); S & S Pawn Shop Inc. v. City of Del City, 947 F.2d 432, 439 (10th Cir. 1991) (upholding warrantless inspection of pawnshop pursuant to an Oklahoma statute that subjected pawnshops to inspection at "reasonable time[s]"); Hodgins v. U.S. Dep't of Agriculture, No. 97-3899, 2000 WL 1785733, at *7 (6th Cir. Nov. 20, 2000) (upholding warrantless administrative search of kennel premises pursuant to the Animal Welfare Act, 7 U.S.C. § 2146, where the USDA implementing regulations limited inspections to business hours and set forth the purposes for which inspections may be made).  The scope of what is "reasonable unaccompanied access" at "reasonable times," 42 C.F.R. § 51.42(c), may be subject to challenge and to judicial interpretation.  Equip for Equality, Inc. v. Ingalls Memorial Hosp., 292 F. Supp. 2d 1086, 1097-1102 (N.D. Ill. 2003) (discussing a number of cases that have addressed whether a particular P&A system's claim to access a particular facility was "reasonable" within the meaning of  42 C.F.R. § 51.42(c)).  However, the fact that the regulation includes a reasonableness requirement cannot render the PAIMI Act's access scheme unconstitutional.

With respect to a P&A system's investigatory authority, HHS regulations authorize a P&A system to gain "reasonable unaccompanied access to residents" of a facility "at all times necessary to conduct a full investigation of an incident of abuse or neglect."  42 C.F.R. § 51.42(b).  This access must include "the opportunity to interview any facility service recipient, employee, or other persons, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation."  Id.  This authority is triggered by one of three specified occurrences: (1) when

"[a]n incident is reported or a complaint is made to the P&A system," (2) when the P&A system

"determines there is probable cause to believe that an incident has or may have occurred," or (3)

when a P&A system "determines that there is or may be imminent danger of serious abuse or

neglect of an individual with mental illness." Id. § 51.42(b)(1)-(3). The purpose of this access is

to determine whether an incident of abuse or neglect has occurred, and to determine what steps

should be taken to remedy the situation. See id. § 51.2 (defining "full investigation" as "the

access to facilities, clients and records authorized under this part that is necessary for a P&A

system to make a determination about whether an allegation of abuse or neglect is taking place or

has taken place").

Because a P&A system's investigatory authority is triggered by some indication that abuse

or neglect has occurred in a particular facility, it does not, strictly speaking, involve a

"suspicionless search," as does the typical administrative search in the closely-regulated-industry

context. See Nicholas v. Goord, 430 F.3d 652, 660 (2d Cir. 2005) (listing administrative searches

of closely regulated businesses as an example where suspicionless warrantless searches have been

upheld). However, the Fourth Amendment analysis is essentially the same. See id. at 652-663

(indicating that the Supreme Court applies the "special needs" analysis to both suspicionless and

individualized-suspicion-based warrantless searches). The low expectation of privacy of closely

regulated industries remains an important factor. The third Burger criterion is also satisfied in this

context: The "time" and "place" of the administrative search is identified in HHS regulations by

the criteria that trigger the P&A system's suspicion that abuse or neglect has occurred. 42 C.F.R.

§ 51.42(b)(1)-(3). The "time" is also governed by 42 C.F.R. § 51.42(b), which authorizes access

"at all times necessary" to investigate the incident. The "scope" of the search is also governed by

42 C.F.R. § 51.42(b), which authorizes a P&A system to have "reasonable" access to facility residents in order to conduct a "full investigation."  Again, the fact that what is "reasonable" in a given situation may be subject to interpretation does not render the administrative scheme unconstitutional.

While HHS regulations refer to a "probable cause" standard as one means of justifying an investigatory search, their use of that phrase should not be understood to invoke the "probable cause" standard that applies in the law enforcement context – nor must that standard be satisfied in order to conduct a warrantless search of a heavily regulated business.  Courts have recognized that in administrative schemes where the authority to conduct a warrantless search based on "special needs" is triggered by individualized suspicion, the level of suspicion required is not connected to the "probable cause" standard that exists in the law enforcement context.[12]  Thus, the First Circuit recognized that it was "largely irrelevant" whether the standard set forth in a Massachusetts statute for "likelihood of serious harm," which triggered the state's authority to enter the home of a mentally ill individual for purposes of civil commitment, "approximates the 'probable cause' inquiry appropriate in the search warrant context." McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 549 n.11 (1st Cir. 1996); cf. New Jersey v. T.L.O., 469 U.S. 325, 340 (1985) (recognizing that "'probable cause' is not an irreducible requirement of a valid search" and that "[t]he fundamental command of the Fourth Amendment is that searches and

_____

[12]The "probable cause" standard in the law enforcement context derives from the Fourth Amendment's Warrants Clause, which states "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  As indicated above, HHS regulations contain their own definition of "probable cause" in 42 C.F.R. § 51.2 (defining the term to mean "reasonable grounds for belief that an individual with mental illness has been, or may be at significant risk of being subject to abuse or neglect").

seizures be reasonable," not that they be supported by probable cause). The First Circuit upheld

the search at issue against a Fourth Amendment challenge. <u>McCabe</u>, 77 F.3d at 554. In <u>T.L.O.</u>,

the Supreme Court upheld a school administrator's search of a student's purse pursuant to a

school policy that allowed such searches based on "reasonable suspicion" of a crime or

"reasonable cause" to believe school policy was being violated. <u>T.L.O.</u>, 469 U.S. at 346.

Similarly, in <u>Iowa P&A Servs.</u>, the court concluded that "the standard Fourth Amendment

definition of 'probable cause' does not apply" to investigatory searches by a P&A system, and

that "[g]rafting a probable cause standard [applicable in the law enforcement context] onto

searches conducted by P&A systems pursuant to the [PAIMI] Act would substantially frustrate

Congress' goal of protecting impaired individuals." <u>Iowa P&A Servs., Inc.</u>, 2004 WL 2270002,

at *8. In other words, law enforcement standards are not invoked simply because HHS regulations

use the term "probable cause." <u>See id.</u> (defining the relevant inquiry as whether a P&A system

"established probable cause to investigate <u>as that term is defined in the [PAIMI] Act</u>" (emphasis

added)); <u>see also Ohio Legal Rights Serv. v. Buckeye Ranch, Inc.</u>, 365 F. Supp. 2d 877, 887

(S.D. Ohio 2005) (recognizing that a P&A system is the "final arbiter" of whether the "probable

cause" requirement in HHS regulations is satisfied (internal quotation omitted) (collecting cases)).


       In sum, facilities that provide care or treatment to mentally ill individuals "cannot help but

be aware that [their] property will be subject to periodic inspections undertaken for specific

purposes." <u>Donovan</u>, 452 U.S. at 600. Moreover, as in <u>Donovan</u>, the PAIMI Act does not

authorize forcible entries into a mental health facility. Rather, the HHS regulations require that an

explanation be provided if access is denied. 42 C.F.R. § 51.43. If entry is refused, the P&A

system would have to seek relief in court, as the plaintiff has done in this case.  As in <u>Donovan</u>, this judicial proceeding would provide "an adequate forum for [the owner] to show that a specific search is outside the federal regulatory authority, or to seek from the district court an order accommodating any unusual privacy interests that the [owner] might have."  <u>Id.</u> at 604-05.  This scheme is reasonable, and the defendants' Fourth Amendment challenge is, accordingly, baseless.

## II.   THE PAIMI ACT DOES NOT VIOLATE THE SEPARATION OF POWERS DOCTRINE

The defendants' challenge to the PAIMI Act under the separation of powers doctrine is without merit.  While the defendants refer to a violation of "the separation of powers clause," there is in fact no clause in the Constitution that expressly uses the phrase "separation of powers." Rather, this is a principle that is embodied in the Constitution as a whole, as indicated by its distribution of federal powers among the three branches of government.  <u>See</u> <u>Nixon v. Administrator of Gen. Servs.</u>, 433 U.S. 425, 443 (1977).  The defendants do not cite any authority that supports the idea that a violation of the separation of powers doctrine may be premised on the ground that they allege – i.e., on the ground that a statute authorizes a search without requiring the authorized entity to obtain a warrant from a judge.  In order to raise a proper issue under the separation of powers principle, the defendants would have to point to some power that is granted to one branch of government in Articles I, II, or III, and argue that another branch of government was improperly performing that function.  <u>See, e.g.</u>, <u>United States v. Barrett</u>, 496 F.3d 1079, 1108 (10th Cir. 2007) (recognizing that the nondelegation doctrine derives from separation of powers principles and the fact that the Constitution, Article I, § 1, vests all "legislative powers" in the Congress).  However, nothing in Article III – the Article

-22-

enumerating the powers of the judicial branch – assigns the power to authorize searches, or to determine "probable cause," to the judicial branch.  The defendants' argument on this point is simply a reformulation of their Fourth Amendment argument, which was addressed above, and is fundamentally at odds with the myriad cases upholding warrantless administrative searches.

As discussed, it is well settled that in some circumstances, warrantless searches may be reasonable under the Fourth Amendment.  T.L.O., 469 U.S. at 340-41 ("The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required." (internal quotation omitted)).  The mere fact that the PAIMI Act and HHS regulations do not require a P&A system to obtain a warrant does not render their framework for allowing access to facilities unconstitutional, either under the Fourth Amendment or under the separation of powers doctrine.  Defendants' separation of powers argument should therefore be rejected.

## III.    THE DEFENDANTS MAY NOT CHALLENGE ACCESS TO ACADEMY RESIDENTS BASED ON RESIDENTS' PRIVACY INTERESTS

The defendants also argue that the access demanded by the plaintiff "violates both student and parental rights."  Def. SJ Mem. at 17.  This argument appears, once again, to be another means of challenging the PAIMI Act under the Fourth Amendment, as the only case that the defendants cite in this section of their brief (at p. 20) addresses a Fourth Amendment challenge to searches of workers' dormitories at a racetrack.  Cf. Anobile v. Pelligrino, 303 F.3d 107, 121 (2d Cir. 2002).  Unlike the workers who asserted this claim in Anobile based on their own expectation of privacy in their dormitory rooms, however, the defendants are not in a position to raise this

argument.  See United States v. Gordon, 168 F.3d 1222, 1226 & n.2 (10th Cir. 1999)

(recognizing that a party may only assert the violation of "his [own] (and not someone else's)

Fourth Amendment rights" (quoting Minnesota v. Carter, 525 U.S. 83, 93)); see also Rozman v.

City of Columbia Heights, 268 F.3d 588, 591 (8th Cir. 2001) (holding landlord could not assert

Fourth Amendment rights of his tenants).  The defendants may not assert the privacy interests of

Academy students or other residents.  Indeed, HHS regulations recognize this fact when they

require a facility that denies access to residents based on "alleged lack of authorization" to

promptly provide the P&A system with the name and contact information for a resident's legal

guardian or legal representative.  See 42 C.F.R. § 51.43.  Moreover, there is no indication that the

interviews of Academy residents that the plaintiff seeks to conduct would be other than voluntary.

See id. § 51.42(c) (indicating a P&A system must honor a resident's request to terminate an

interview).  Assuming that to be the case, these proposed interviews would not implicate the

Fourth Amendment because they would not constitute a "seizure."  Cf. Sanchez v. County of San

Diego, 464 F.3d 916, 921 (9th Cir. 2006) (home visits to ensure welfare eligibility, including

interviews, when conducted with a resident's consent, do not constitute a search or seizure under

the Fourth Amendment).  Accordingly, the defendants may not assert the privacy interests of

Academy residents as a basis for their constitutional challenge, and their arguments on this issue

should be disregarded.

## CONCLUSION

For the reasons set forth above, the Court should reject the defendants' constitutional

challenge to the PAIMI Act.

Dated: June 8, 2009                    Respectfully submitted,

                                       TONY SCOTT
                                       Assistant Attorney General
                                       BRETT L. TOLMAN  (#8821)
                                       United States Attorney
                                       JARED C. BENNETT
                                       Assistant United States Attorney (#9097)

                                       SHEILA LIEBER
                                       Deputy Director
                                       /s/ Kathryn L. Wyer
                                       KATHRYN L. WYER (#9846)
                                       Trial Attorney
                                       U.S. Department of Justice, Civil Division
                                       Federal Programs Branch
                                       20 Massachusetts Ave., N.W.
                                       Washington, D.C. 20530
                                       Telephone: (202) 616-8475
                                       Facsimile: (202) 616-8470
                                       Email: kathryn.wyer@usdoj.gov